## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## (EASTERN DIVISION)

| | | |
|---|---|---|
| MARK ELFERS, Derivatively on Behalf of Nominal Defendant ABBVIE, INC., | ) ) ) | CASE NO.: 19-934 |
| Plaintiff, | ) ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| RICHARD A. GONZALEZ, ROXANNE S. AUSTIN, ROBERT J. ALPERN, EDWARD M. LIDDY, EDWARD J. RAPP, MELODY B. MEYER, GLENN F. TILTON, FREDERICK H. WADDELL, WILLIAM H.L. BURNSIDE, BRETT J. HART, and WILLIAM J. CHASE, | ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| Defendants, | ) ) | |
| ABBVIE, INC., a Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) ) | |

Plaintiff Mark Elfers ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant AbbVie, Inc. ("AbbVie" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by AbbVie with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of AbbVie, against certain of its officers and/or directors named as defendants herein seeking to

remedy their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from October 25, 2013 to the present (the "Relevant Period"). Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to AbbVie, including damages to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) AbbVie maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to AbbVie, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

5.      *Plaintiff Mark Elfers* is a current AbbVie shareholder during the Relevant Period. Plaintiff will continue to hold AbbVie shares throughout the pendency of this action. Plaintiff will

2

fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

6.      Nominal Defendant AbbVie is a Delaware corporation headquartered at 1 North Waukegan Road, North Chicago, Illinois 60064.

**Director Defendants**

7.      ***Defendant Richard A. Gonzalez*** ("Gonzalez") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Board") since December 2012.  Defendant Gonzalez owns 279,337 shares of the Company's stock, which is roughly $31.3 million worth of AbbVie stock.

8.      For year ended December 31, 2017, Defendant Gonzalez received $22,625,243 in compensation from the Company, which included $1,638,462 in salary, $9,606,360 in stock awards, $2,559,270 in option awards, $4,331,250 in non-equity incentive plan compensation, $3,496,704 in change in pension value and non-qualified deferred compensation earnings, and $993,197 in all other compensation.

9.      At the time the Company was issuing false and misleading information to the market, Defendant Gonzalez sold the following Company stock:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 02/28/18 | 8,280 | $117.89 | $976,129.20 |
| 11/21/17 | 218,193 | $94.01 | $218,287.01 |
| 08/07/17 | 193,131 | $71.03 | $13,718,094.00 |
| 08/04/17 | 22,038 | $71.08 | $1,566,461.00 |
| 08/03/17 | 65,861 | $71.00 | $4,676, 131.00 |
| 05/19/17 | 71,235 | $65.48 | $4,664,467.80 |
| 03/08/17 | 72,016 | $64.25 | $4,627,028.00 |
| 06/02/16 | 285,953 | $63.87 | $18,263,818.00 |
| 05/11/16 | 39,000 | $63.80 | $2,488,200.00 |
| 07/29/15 | 40,021 | $71.25 | $2,851,496.20 |
| 07/29/15 | 24,979 | $71.09 | $1,775,757.10 |
| 04/28/15 | 62,932 | $64.87 | $4,079,881.50 |
| 04/28/15 | 8,281 | $64.93 | $537,685.33 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 04/08/15 | 1,300 | $64.87 | $84,331.00 |
| 04/04/14 | 4,799 | $51.20 | $245,708.80 |

10.     Defendant Gonzalez sold 1,118,019 shares of Company stock with knowledge of material non-public information.

11.     **Defendant Roxanne S. Austin** ("Austin") has served as a Company director since 2013.  Defendant Austin also serves as Chairperson of the Audit Committee and a member of the Compensation Committee.  Defendant Austin owns 36,296 shares of the Company's common stock, which is roughly $4 million worth of AbbVie stock.

12.     For the year ended December 31, 2017, Defendant Austin received $320,300 in compensation from the Company, which included $130,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $5,319 in all other compensation.

13.     **Defendant Robert J. Alpern** ("Alpern") has served as a Company director since 2013.  Defendant Alpern also serves as a member of the Nominations and Governance Committee and the Public Policy Committee.  Defendant Alpern owns 21,789 shares of the Company's common stock, which is roughly $2.4 million worth of AbbVie stock.

14.     For the year ended December 31, 2017, Defendant Alpern received $335,929 in compensation from the Company, which includes $105,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, $20,948 in change in pension value and nonqualified deferred compensation earnings, and $25,000 in all other compensation.

15.     **Defendant Edward M. Liddy** ("Liddy") has served as a Company director since 2013.  Defendant Liddy also serves as Chairperson of the Compensation Committee and as a member of the Public Policy Committee.  Defendant Liddy owns 18,351 shares of the Company's common stock, which is roughly $2 million worth of AbbVie stock.

16.     For the year ended December 31, 2017, Defendant Liddy received $309,981 in compensation from the Company, which included $125,000 in fees earned or paid in cash and $184,981 in restricted stock unit awards.

4

17.    **Defendant Edward J. Rapp** ("Rapp") has served as a Company director since 2013. Defendant Rapp also serves as Chairperson of the Public Policy Committee and as a member of the Audit Committee.  Defendant Rapp owns 15,498 shares of the Company's common stock, which is roughly $1.7 million worth of AbbVie stock.

18.    For the year ended December 31, 2017, Defendant Rapp received $342,025 in compensation from the Company, which included $131,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $26,044 in all other compensation.

19.    **Defendant Melody B. Meyer** ("Meyer") has served as a Company director since May 2017.  Defendant Meyer also serves as a member of the Audit Committee and the Public Policy Committee.  Defendant Meyer owns 2,770 shares of the Company's common stock, which is roughly $310,849 worth of AbbVie stock.

20.    For the year ended December 31, 2017, Defendant Meyer received $274,731 in compensation from the Company, which included $64,750 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

21.    **Defendant Glenn F. Tilton** ("Tilton") has served as a Company director since 2013. Defendant Tilton also serves as Lead Director, Chairperson of the Nominations and Governance Committee, and as a member of the Compensation Committee.  Defendant Tilton owns 32,786 shares of the Company's common stock, which is roughly $3.6 million worth of AbbVie stock.

22.    For the year ended December 31, 2017, Defendant Tilton received $359,981 in compensation from the Company, which included $150,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

23.    **Defendant Frederick H. Waddell** ("Waddell") has served as a Company director since 2013.  Defendant Waddell also serves as a member of the Audit Committee and the Compensation Committee.  Defendant Waddell owns 15,230 shares of the Company's common stock, which is roughly $1.7 million worth of AbbVie stock.

5

24.     For the year ended December 31, 2017, Defendant Waddell received $320,981 in compensation from the Company, which included $111,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

25.     **Defendant William H.L. Burnside** ("Burnside") has served as a Company director since 2013.  Defendant Burnside also serves as a member of the Audit Committee and Nominations and Governance Committee.  Defendant Burnside owns 13,230 shares of the Company's common stock, which is roughly $1.4 million worth of AbbVie stock.

26.     For the year ended December 31, 2017, Defendant Burnisde received $320,981 in compensation from the Company, which included $111,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

27.     **Defendant Brett J. Hart** ("Hart") has served as a Company director since 2016. Defendant Hart also serves as a member of the Nominations and Governance Committee. Defendant Hart owns 5,744 shares of the Company's common stock, which is roughly $644,591 worth of AbbVie stock.

28.     For the year ended December 31, 2017, Defendant Hart received $314,981 in compensation from the Company, which included $105,000 in fees earned or paid in cash, $184,981 in restricted stock unit awards, and $25,000 in all other compensation.

29.     Defendants Gonzalez, Austin, Alpern, Liddy, Rapp, Meyer, Tilton, Wadell, Burnside and Hart are collectively referred to herein as the "Director Defendants".

**Officer Defendant**

30.     **Defendant William J. Chase** ("Chase") has served as the Company's Executive Vice President, Finance and Administration since October 19, 2018, and also served as the Company's Executive Vice President, Chief Financial Officer ("CFO") from December 2012 until October 19, 2018.  Defendant Chase owns 184,044 shares of the Company's stock, which is roughly $20.6 million worth of AbbVie stock

6

772490.1

31.     For the year ended December 31, 2017, Defendant Chase received $12,044,593 in compensation from the Company, which included $1,008,526 in salary, $3,681,906 in stock awards, $980,980 in option awards, $1,954,549 in non-equity incentive plan compensation, $4,223,300 in change in pension value and non-qualified deferred compensation earnings, and $195,332 in all other compensation.

32.     At the time the Company was issuing false and misleading information to the market, Defendant Chased sold the following Company stock:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 02/28/18 | 38,528 | $119.44 | $4,601,784.30 |
| 03/01/18 | 32,400 | $114.5 | $3,709,800.00 |
| 05/18/17 | 38,300 | $65.35 | $2,502,905.00 |
| 12/02/16 | 6,600 | $59.19 | $390,654.00 |
| 12/22/14 | 8,495 | $68.00 | $577,660.00 |
| 03/03/14 | 3,948 | $50.53 | $199,492.44 |

33.     Defendant Chase sold 128,271 shares of Company stock (for which he received over $11.9 million) with knowledge of material non-public information.

34.     Defendant Chase, along with the Directors Defendants, are collectively referred to herein as "Defendants".

## CORPORATE GOVERNANCE

35.     As members of AbbVie's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

## THE COMPANY'S CODE OF BUSINESS CONDUCT

36.     The Company has a Code of Business Conduct Handbook.  It states in relevant part:

WE MAKE GOOD DECISIONS OUR CODE CANNOT TELL YOU WHAT TO DO IN EVERY SITUATION.

In most circumstances, if you abide by our policies and procedures and the law, your decision is probably the right one. Use your best judgment. Be honest and fair. If the right choice is not clear, consult your manager, the Office of Ethics and Compliance,

7

our Legal Department or another one of our Contacts.

\* \* \*

WE INTERACT HONESTLY WITH HEALTHCARE PROVIDERS HEALTHCARE PROVIDERS ARE AT THE FRONT LINES OF DISEASE MANAGEMENT.

We collaborate to ensure our products are appropriately prescribed and distributed to the patients who need them. Our dedication to clear communications with healthcare providers serves the best interests of patients and supports medical advancements.

We take care to ensure product information is accurate, comprehensive, relevant and up to date. We are fair and open in our dealings with healthcare providers and customers. We do not offer or give gifts or other items or services of value as a means to earn favor for our products or to sway medical judgment. We rely on product quality and healthcare outcomes to influence purchasing and prescribing practices. This reinforces the positive reputation we have earned worldwide.

\* \* \*

WE FOLLOW INDUSTRY LAWS AND REGULATIONS

WE VALUE THE LONG-STANDING TRUST WE HAVE EARNED WORLDWIDE.

Patients, healthcare providers, customers and suppliers know they can rely on us because we comply with the laws, regulations and codes that govern the pharmaceutical industry and our company (e.g., European Federation of Pharmaceutical Industries and Associations [EFPIA] and International Federation of Pharmaceutical Manufacturers and Associations [IFPMA]).

\* \* \*

WE MAINTAIN TRUSTWORTHY BUSINESS PRACTICES

WE COMPLY WITH ALL APPLICABLE LAWS THAT REGULATE OUR BUSINESS.

Many of these laws concern the way we promote and sell our medical products. It is never acceptable to try to influence purchasing decisions in any way that is unethical, inappropriate or illegal or creates a potential conflict of interest.

We are honest, open and up-front when we interact with those who may be interested in buying or prescribing our products.

772490.1

\*    \*    \*

WE COMPLY WITH ANTI-BRIBERY AND ANTI-CORRUPTION LAWS

WE DO NOT TOLERATE IMPROPER PAYMENTS. WE UNDERSTAND THAT ACCEPTING, OFFERING OR GIVING ANYTHING OF VALUE TO INFLUENCE

A BUSINESS DECISION OR GAIN AN UNFAIR BUSINESS ADVANTAGE IS IMPROPER.

We also understand that improper payments received or given can have severe repercussions for the individuals involved, for AbbVie and ultimately, for our industry and the people we serve. We are careful to maintain accurate books and records to reflect all payments made and received, and we avoid even the appearance of anything improper.

We recognize that we may be responsible for improper payments made by third parties conducting business on our behalf, so we have due diligence processes in place to ensure we know who we are working with, that they have a reputation for operating honestly and with integrity and that any payments made on our behalf are appropriate.

Although common in some countries, we prohibit "facilitation" payments to public officials for taking routine governmental actions.

\*    \*    \*

WE COMPLY WITH INSIDER TRADING LAWS

IN THE COURSE OF OUR JOBS, WE MAY HEAR OR KNOW ABOUT A COMPANY'S BUSINESS ACTIVITIES OR PLANS THAT ARE NOT YET PUBLICIZED.

Information that has not been made public, but if known, may persuade a reasonable investor to buy, sell or hold a company's securities is called "inside" or "nonpublic" information. Never use this information – whether it is about AbbVie or any other company -- to conduct a trade. Never "tip" someone else on what you know so that they may trade. Insider trading and tipping are illegal.

\*    \*    \*

WE ARE ALERT FOR PAYMENTS FROM SUSPICIOUS SOURCES

PURCHASES AND PAYMENTS MADE IN UNUSUAL WAYS MAY SIGNAL ILLEGAL ACTIVITY.

9

Watch out for payments made to AbbVie or on our behalf that come from an unknown source, are all-cash payments or are payments made through a personal bank account or financial institution with no relation to the customer or business partner. Report any such transaction that you feel is suspicious to our Legal Department or Finance Department.

## DUTIES OF THE DIRECTOR DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of AbbVie and because of their ability to control the business and corporate affairs of AbbVie, the Director Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage AbbVie in a fair, just, honest, and equitable manner. The Director Defendants were and are required to act in furtherance of the best interests of AbbVie and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

38.     Each director and officer of the Company owes to AbbVie and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

39.     The Director Defendants, because of their positions of control and authority as directors and/or officers of AbbVie, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with AbbVie, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of AbbVie.

40.     To discharge their duties, the officers and directors of AbbVie were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of AbbVie were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how AbbVie conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

41.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director

772490.1

Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of AbbVie, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.     In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public shareholders, or to allow other AbbVie directors, officers, and/or employees to do so.  Each director and officer of the Company also owed AbbVie and its shareholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

43.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*.  The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action (and related lawsuits).  As a result, AbbVie has expended, and will continue to expend, significant sums of money.

44.     The Director Defendants' actions have irreparably damaged AbbVie's corporate image and goodwill.

## COMPANY BACKGROUND AND INFORMATION

45.     HUMIRA is the brand name for adalimumab, a tumor necrosis factor (TNF) inhibiting anti-inflammatory drug administered by subcutaneous injection.  HUMIRA was a top-selling drug for AbbVie in 2017, with sales of over $12 billion.

46.     The Company's largest product is HUMIRA (adalimumab).   HUMIRA had worldwide net revenues of approximately $18.4 billion in 2017 and is one of the world's greatest selling medications.

772490.1

47.     During the Relevant Period, the Company rewarded healthcare providers with kickbacks in order to induce them to write more prescriptions and refills for HUMIRA.

48.     AbbVie paid for registered nurses that it called Ambassadors to help doctors with patients who were taking Humira.  While the nurses were represented to patients as an extension of the doctor's office, they were trained to tout the drug while downplaying its risks.

49.     AbbVie spent millions convincing patients and health care professionals that AbbVie Ambassadors were patient advocates -- in fact, the Ambassadors were Humira advocates hired to do one thing, keep patients on a dangerous drug at any cost.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

50.     On October 25, 2013, the Company filed a Form 8-K with the SEC announcing its third quarter 2013 fiscal results ("3Q 2013 Press Release").  In the 3Q 2013 Press Release, Defendant Gonzalez stated that the Company's "third-quarter performance demonstrates the strength and durability of our product portfolio and the continued execution of our key strategic priorities as an independent biopharmaceutical company[.]"

51.     On February 21, 2014, the Company caused to be filed with the SEC an annual report for the fiscal year ended December 31, 2013 on Form 10-K (the "2013 10-K").  The 2013 10-K was signed by Defendants Gonzalez and Chase. The 2013 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Gonzalez and Chase attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

52.     The 2013 10-K reported the Company's strategic objectives to "drive HUMIRA sales growth[,]":

*Strategic Objectives*

AbbVie's long-term strategy is to maximize its existing portfolio of products through new indications, share gains, increased geographic expansion in underserved markets while also advancing its new product pipeline to meet unmet medical needs. To successfully execute its long-term strategy, AbbVie will focus on expanding

13

HUMIRA sales, advancing the pipeline, expanding its presence in emerging markets and managing its product portfolio to maximize value. AbbVie expects to continue to drive strong HUMIRA sales growth in several ways. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as uveitis, hidradenitis suppurativa and pediatric Crohn's disease. AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets.

53.    The 2013 10-K also reported that the Company is subject to anti-kickback laws and state laws relating to sales and marketing practices, stating in relevant part:

> ***Laws and regulations affecting government benefit programs could impose new obligations on AbbVie, require it to change its business practices, and restrict its operations in the future.***
>
> The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in material adverse effect on its business and results of operations.

54.    On March 24, 2014, the Company caused to be filed with the SEC a Schedule 14A ("2014 Proxy Statement"), which contained material misstatements and omissions.

55.    The 2014 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  The 2014 Proxy Statement was false and misleading because the Company's Code of Conduct and Governance Guidelines were not followed.

56.    Defendants caused the 2014 Proxy Statement to be false and misleading regarding the executive compensation.  For example, the 2014 Proxy Statement purported to employ a "pay-

14

for performance process" and at the same time failing to disclose that the Company's financial prospects were false and misleading, causing the Company's stock to be artificially inflated and allowing Defendants to wrongfully benefit. In addition, the 2014 Proxy Statement failed to disclose that: (a) the Company engaged in a kickback scheme, leading to increased scrutiny from governmental agencies; and (b) the Company failed to maintain internal controls.

57.     On February 20, 2015, the Company caused to be filed with the SEC an annual report for the fiscal year ended December 31, 2014 on Form 10-K (the "2014 10-K"). The 2014 10-K was signed by Defendants Gonzalez and Chase. The 2014 10-K also contained signed SOX certifications by Defendants Gonzalez and Chase attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

58.     The 2014 10-K enumerated the Company's strategic objectives for 2015 to "continue to drive strong HUMIRA sales growth[,]":

***2015 Strategic Objectives***

In 2015, AbbVie expects sales performance to be driven by continued strong growth from HUMIRA, the launch of VIEKIRA PAK, and sales growth in certain key products including Creon and Duodopa, partially offset by a decline in several products due to generic competition, including AndroGel 1% and the remainder of the lipid franchise. In addition, AbbVie expects to achieve operating margin improvements while continuing to invest in its pipeline in support of opportunities in oncology, HCV, and immunology, as well as continued investment in key products. AbbVie expects to grow operating cash flows in 2015, which will enable the company to continue to augment its pipeline through concerted focus on strategic licensing, acquisition and partnering activity and returning cash to shareholders via dividends and share repurchases. AbbVie expects to continue to drive strong HUMIRA sales growth in several ways. AbbVie seeks to expand the HUMIRA patient base by applying for regulatory approval of new indications for HUMIRA, treating conditions such as uveitis and hidradenitis suppurativa. AbbVie will also seek to drive HUMIRA sales growth by expanding its market share and its presence in underserved markets. AbbVie plans to continue making investments in key emerging markets, including Brazil, China, and Russia.

59.     The 2014 10-K also stated the Company is subject to anti-kickback laws and state

laws relating to sales and marketing practices:

> ***Laws and regulations affecting government benefit programs could impose new obligations on AbbVie, require it to change its business practices, and restrict its operations in the future***.
>
> The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

60.     On March 20, 2015, the Company caused to be filed with the SEC a Schedule 14A

(the "2015 Proxy Statement").

61.     The 2015 Proxy Statement states that the Company's executive officers submit

annually certifications related to their compliance with the Code of Conduct and that the Company

requires mandatory training on its code of conduct.  The 2015 Proxy Statement was false and

misleading as the Company's Code of Conduct and Governance Guidelines were not followed as a

result of the misconduct detailed herein.

62.     Defendants caused the 2015 Proxy Statement to be false and misleading regarding

the executive compensation.  For example, the 2015 Proxy Statement purported to employ a "pay-

for performance process" and at the same time failing to disclose that the Company's financial

prospects were false and misleading, causing the Company's stock to be artificially inflated and

allowing Defendants to wrongfully benefit.  In addition, the 2015 Proxy Statement failed to disclose

that: (a) the Company engaged in the kickback scheme, leading to increased scrutiny from governmental agencies; and (b) the Company failed to maintain internal controls.

63. On February 19, 2016, the Company caused to be filed with the SEC an annual report for the fiscal year ended December 31, 2015 on Form 10-K (the "2015 10-K"). The 2015 10-K was signed by Defendants Gonzalez and Chase. The 2015 10-K also contained signed SOX certifications by Defendants Gonzalez and Chase attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

64. The 2015 10-K enumerated the Company's strategic objectives for 2016 to increase "HUMIRA sales growth[,]":

### 2016 Strategic Objectives

AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. AbbVie intends to continue to advance its mission in a number of ways, including (i) growing revenues through continued strong performance from its existing portfolio of on-market products, including its flagship brands, HUMIRA, IMBRUVICA and VIEKIRA PAK, as well as growth from pipeline products; (ii) expanding gross and operating margins; (iii) continued investment in its pipeline in support of opportunities in immunology, oncology, and virology, as well as continued investment in key on-market products; (iv) augmentation of its pipeline through concerted focus on strategic licensing, acquisition and partnering activity with a focus on identifying compelling programs that fit AbbVie's strategic criteria; and (v) returning cash to shareholders via dividends and share repurchases. In addition, AbbVie anticipates several regulatory submissions and key data readouts from key clinical trials in 2016.

AbbVie expects to achieve its revenue growth objectives as follows:

• HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution and expansion to new indications for hidradenitis suppurativa (regulatory approval in the United States and EU achieved in 2015) and uveitis (regulatory submissions in the United States and the EU are under review with approval expected in 2016).

17

65.     The 2015 10-K stated the Company is subject to anti-kickback laws and state laws relating to sales and marketing practices, stating in relevant part:

> ***Laws and regulations affecting government benefit programs could impose new obligations on AbbVie, require it to change its business practices, and restrict its operations in the future.***
>
> The health care industry is subject to various federal, state, and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation, and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

66.     On March 21, 2016, the Company caused to be filed with the SEC a Schedule 14A (the "2016 Proxy Statement").

67.     The 2016 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  The 2016 Proxy Statement was false and misleading as the Company's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein.

68.     Defendants caused the 2016 Proxy Statement to be false and misleading regarding the executive compensation.  For example, the 2016 Proxy Statement purported to employ a "pay-for performance process" and at the same time failing to disclose that the Company's financial prospects were false and misleading, causing the Company's stock to be artificially inflated and allowing Defendants to wrongfully benefit.  In addition, the 2016 Proxy Statement failed to disclose

18

that: (a) the Company engaged in a kickback scheme, leading to increased scrutiny from governmental agencies; and (b) the Company failed to maintain internal controls.

69. On February 17, 2017, the Company caused to be filed with the SEC an annual report for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K"). The 2016 10-K was signed by Defendants Gonzalez and Chase. The 2016 10-K also contained signed SOX certifications by Defendants Gonzalez and Chase attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

70. The 2016 10-K enumerated the Company's strategic objectives for 2017 to drive "HUMIRA sales growth[,]":

### *2017 Strategic Objectives*

AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. AbbVie intends to continue to advance its mission in a number of ways, including: (i) growing revenues through continued strong performance from its existing portfolio of on-market products, including its flagship brands, HUMIRA and IMBRUVICA as well as growth from pipeline products; (ii) expanding operating margins; (iii) continued investment in its pipeline in support of opportunities in immunology, oncology, virology and neurology as well as continued investment in key on-market products; (iv) augmentation of its pipeline through concerted focus on strategic licensing, acquisition and partnering activity with a focus on identifying compelling programs that fit AbbVie's strategic criteria; and (v) returning cash to shareholders via dividends and share repurchases. In addition, AbbVie anticipates several regulatory submissions and key data readouts from key clinical trials in the next twelve months.

AbbVie expects to achieve its strategic objectives as follows:

•      HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution.

71. The 2016 10-K stated the Company is subject to anti-kickback laws and state laws relating to sales and marketing practices, stating in relevant part:

*Laws and regulations affecting government benefit programs could impose new obligations on AbbVie, require it to change its business practices, and restrict its operations in the future.*

The health care industry is subject to various federal, state and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price reporting and regulation and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment and exclusion from participation in federal and state health care programs, including Medicare, Medicaid and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

72.     On March 20, 2017, the Company caused to be filed with the SEC a Schedule 14A (the "2017 Proxy Statement").

73.     The 2017 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  The 2017 Proxy Statement was false and misleading as the Company's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein.

74.     Defendants caused the 2017 Proxy Statement to be false and misleading regarding the executive compensation.  For example, the 2017 Proxy Statement purported to employ a "pay-for performance process" and at the same time failing to disclose that the Company's financial prospects were false and misleading, causing the Company's stock to be artificially inflated and allowing Defendants to wrongfully benefit.  In addition, the 2017 Proxy Statement failed to disclose that: (a) the Company engaged in a kickback scheme, leading to increased scrutiny from governmental agencies; and (b) the Company failed to maintain internal controls.

75.     On February 16, 2018, the Company caused to be filed with the SEC its annual report for the fiscal year ended December 31, 2017 on Form 10-K (the "2017 10-K").  The 2017 10-K was signed by Defendants Gonzalez and Chase.  The 2017 10-K also contained signed SOX certifications by Defendants Gonzalez and Chase attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

76.     The 2017 10-K enumerated the Company's strategic objectives for 2018 to drive "HUMIRA sales growth[,]":

*2018 Strategic Objectives*

AbbVie's mission is to be an innovation-driven, patient-focused specialty biopharmaceutical company capable of achieving top-tier financial performance through outstanding execution and a consistent stream of innovative new medicines. AbbVie intends to continue to advance its mission in a number of ways, including: (i) growing revenues by diversifying revenue streams, driving late-stage pipeline assets to the market and ensuring strong commercial execution of new product launches; (ii) continued investment and expansion in its pipeline in support of opportunities in immunology, oncology and neurology as well as continued investment in key on-market products; (iii) expanding operating margins; and (iv) returning cash to shareholders via dividends and share repurchases. In addition, AbbVie anticipates several regulatory submissions and key data readouts from key clinical trials in the next twelve months.

AbbVie expects to achieve its strategic objectives through:

•      HUMIRA sales growth by driving biologic penetration across disease categories, increasing market leadership, strong commercial execution and expansion.

77.     The 2017 10-K stated the Company is subject to anti-kickback laws and state laws relating to sales and marketing practices, stating in relevant part:

***Laws and regulations affecting government benefit programs could impose new" obligations on AbbVie, require it to change its business practices, and restrict its operations in the future.***

The health care industry is subject to various federal, state and international laws and regulations pertaining to government benefit programs reimbursement, rebates, price

reporting and regulation and health care fraud and abuse. In the United States, these laws include anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil sanctions, including, in some instances, substantial fines, imprisonment and exclusion from participation in federal and state health care programs, including Medicare, Medicaid and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to change and evolving interpretations, which could require AbbVie to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt AbbVie's business and result in a material adverse effect on its business and results of operations.

78.     On March 19, 2018, the Company caused to be filed with the SEC a Schedule 14A (the "2018 Proxy Statement").

79.     The 2018 Proxy Statement states that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  The 2018 Proxy Statement was false and misleading as the Company's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein.

80.     Defendants caused the 2018 Proxy Statement to be false and misleading regarding the executive compensation.  For example, the 2018 Proxy Statement purported to employ a "pay-for performance process" and at the same time failing to disclose that the Company's financial prospects were false and misleading, causing the Company's stock to be artificially inflated and allowing Defendants to wrongfully benefit.  In addition, the 2018 Proxy Statement failed to disclose that: (a) the Company engaged in a kickback scheme, leading to increased scrutiny from governmental agencies; and (b) the Company failed to maintain internal controls.

81.     The statements contained above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Defendants made false and/or misleading statements and/or failed to disclose that: (a) AbbVie's strategy to increase the sales growth of its blockbuster drug, HUMIRA, relied in

22

part upon illegal kickbacks and unlawful sales and marketing tactics; (b) such practices would foreseeably lead to heightened scrutiny by State governments and agencies; and (c) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

82.     On September 18, 2018, *Bloomberg* published an article entitled, "California Sues AbbVie Over Alleged Arthritis Drug Kickbacks," reporting that the State of California filed a lawsuit against AbbVie for engaging in a kickback scheme aimed to boost HUMIRA sales (the "California Complaint"). The article provides that the lawsuit seeks damages involving "private insurance claims." The article states in relevant part:

> California's insurance regulator is suing AbbVie Inc., alleging that the pharmaceutical giant gave illegal kickbacks to health-care providers in order to keep patients on its blockbuster rheumatoid arthritis drug Humira.

> The company "engaged in a far-reaching scheme including both classic kickbacks -- cash, meals, drinks, gifts, trips, and patient referrals -- and more sophisticated ones -- free and valuable professional goods and services to physicians to induce and reward Humira prescriptions," the California Department of Insurance said in a statement.

> According to the state, AbbVie paid for registered nurses that it called ambassadors to help doctors with patients who were taking Humira. While the nurses were represented to patients as an extension of the doctor's office, they were trained to tout the drug while downplaying its risks, the state said. "AbbVie spent millions convincing patients and health care professionals that AbbVie Ambassadors were patient advocates -- in fact, the Ambassadors were Humira advocates hired to do one thing, keep patients on a dangerous drug at any cost," Insurance Commissioner Dave Jones said in the statement.

> The alleged misconduct "is particularly egregious because it's well known the drug has very adverse side effects," said Jones in a press conference. Under the ambassador system, complaints or concerns about serious infections, blood problems, or even heart failure -- all known side effects of Humira -- could go unreported to patients' physicians, he said.

*        *        *

23

772490.1

Humira is one of the world's biggest-selling medications. The drug brought in $18.4 billion in 2017, accounting for roughly two-thirds of North Chicago, Illinois-based AbbVie's revenue. Private insurers have paid out $1.2 billion in Humira-related claims, according to Jones.

\*    \*    \*

Jones is intervening in a whistleblower complaint filed in California by a nurse who was employed as an AbbVie ambassador in Florida several years ago. The suit, filed in Alameda County Superior Court, seeks three times the amount of each claim made for Humira as a result of the alleged kickbacks. The lawsuit involves private insurance claims, said Nancy Kincaid, a spokeswoman for the California Department of Insurance.

83.     According to the California Complaint, relator-plaintiff Lazaro Suarez worked for AbbVie via its sub-contractor, Quintiles Transactional Holdings, Inc., as a "Nurse Educator" and "Patient Ambassador" from approximately March 23, 2013 and October 2014.  In that position, he "became aware of AbbVie's [kickback] scheme nationwide, including in California, because of his role as a trainer, among other ways.  After leaving his employment, Mr. Suarez continued to obtain information about the allegations [described in the California Complaint], including through ongoing contacts with AbbVie and Quintiles personnel." The California Complaint states the alleged fraudulent conduct occurred from 2013 to the present.

84.     On this news, shares of AbbVie fell $4.35 per share or over 4.5% over the next two consecutive trading days to close at $91.02 per share on September 19, 2018.

**FALSE AND MISLEADING STATEMENTS REGARDING THE TENDER OFFER**

85.     On May 30, 2018, Defendants caused the Company to issue a press release announcing the preliminary results of the Tender Offer.  The press release announced:

Based on the preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 75,743,313 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $105 per share, including 49,129,844 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 94.3 percent.

24

In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 71.4 million shares of its common stock at a price of $105 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.5 percent of the shares outstanding. The number of shares to be purchased and the purchase price are preliminary and subject to change. The preliminary information contained in this press release is subject to confirmation by the depositary and is based on the assumption that all shares tendered through notice of guaranteed delivery will be delivered within the two trading day settlement period. The final number of shares to be purchased and the final purchase price will be announced following the expiration of the guaranteed delivery period and completion by the depositary of the confirmation process. Payment for the shares accepted for purchase under the tender offer and return of all other shares tendered and not purchased, will occur promptly thereafter.

86.     On this news, the price per share of Company stock was trading as high as $103.16 on May 30, 2018, ultimately closing at $103.01 on that date, which was $3.54 higher than its closing price on May 29, 2018.

### THE TRUTH EMERGES

87.     Later that day, on May 30, 2018, the Company issued a press release announcing updated preliminary results of the Tender Offer.  The press release stated:

This update replaces the preliminary results announced at 8:00 am, New York City time, on May 30, 2018. This update reflects additional shares that were validly tendered by notice of guaranteed delivery, but that were erroneously omitted from the initial preliminary results provided to AbbVie by Computershare Trust Company, N.A., the depositary for the tender offer. Final results of the tender offer will be issued no later than June 4, 2018 following the expiration of the notice of guaranteed delivery period.

Based on the updated preliminary count by Computershare Trust Company, N.A., the depositary for the tender offer, a total of 74,033,457 shares of AbbVie's common stock, $0.01 par value per share, were properly tendered and not properly withdrawn at or below the purchase price of $103 per share, including 52,915,569 shares that were tendered by notice of guaranteed delivery. AbbVie has been informed by the depositary that the preliminary proration factor for the tender offer is approximately 98.4 percent.

In accordance with the terms and conditions of the tender offer, and based on the preliminary count by the depositary, AbbVie expects to acquire approximately 72.8

million shares of its common stock at a price of $103 per share, for an aggregate cost of approximately $7.5 billion, excluding fees and expenses relating to the tender offer. These shares represent approximately 4.6 percent of the shares outstanding. The number of shares to be purchased and the purchase price are preliminary and subject to change. The preliminary information contained in this press release is subject to confirmation by the depositary and is based on the assumption that all shares tendered through notice of guaranteed delivery will be delivered within the two trading day settlement period. The final number of shares to be purchased and the final purchase price will be announced following the expiration of the guaranteed delivery period and completion by the depositary of the confirmation process. Payment for the shares accepted for purchase under the tender offer and return of all other shares tendered and not purchased, will occur promptly thereafter.

88.     On this news, the price per share of the Company stock fell $4.07, or almost 4%, from the previous day's closing price, closing at $98.94 on May 31, 2018.

## DEMAND FUTILITY ALLEGATIONS

89.     Plaintiff brings this action derivatively in the right and for the benefit of AbbVie to redress injuries suffered and to be suffered by AbbVie because of the breaches of fiduciary duty and other wrongs as alleged herein by the Director Defendants.

90.     Plaintiff will adequately and fairly represent the interests of AbbVie and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

91.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

92.     Because of the facts set forth herein, Plaintiff has not made a demand on the Board of AbbVie to institute this action against the Director Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The AbbVie Board is currently comprised of

26

Defendants Gonzalez, Alpern, Austin, Burnside, Hart, Liddy, Meyer, Rapp, Tilton, and Waddell. Thus, Plaintiff is required to show that a majority of the Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

93.     The Director Defendants face a substantial likelihood of liability in this action because they caused AbbVie to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with AbbVie, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

94.     The Director-Defendants knew of the falsity of the misleading statements at the time they were made and of the Company's engagement in the kickback scheme as it was occurring. HUMIRA is the Company's largest product and is responsible for the majority of the Company's revenue. The prescription of HUMIRA goes to the core operations of AbbVie.

95.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for AbbVie shareholders.

96.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

97.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

98.     The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

99.     The Director Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## ADDITIONAL FACTS REGARDING DEMAND FUTILITY

### Defendant Gonzalez

100.     Demand on Defendant Gonzalez is futile.  Defendant Gonzalez has served as the Company's CEO and Chairman of the Board since December 2012.  The Company also admits that Defendant Gonzalez is a non-independent director.  Further, Defendant Gonzalez receives significant compensation from the Company, including $22,625,243 in the fiscal year ended December 31, 2017. Defendant Gonzalez's insider sales before the scheme was exposed, yielded him over $60.7 million in proceeds.  This demonstrates his motive in facilitating and participating in the kickback scheme. As the Company's highest officer, Defendant Gonzalez conducted little oversight of the Company's engagement in the kickback scheme, consciously disregarded his duties to monitor such controls over

28

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

101.    In addition, Defendant Gonzalez is a defendant in the securities class action entitled *Holwill v. Abbvie, Inc., et al.*, Case: 1:18-cv-06790 (N.D. Il.) ("Securities Class Action").  For these reasons, Defendant Gonzalez faces a substantial likelihood of liability and thus demand upon him is futile and, therefore, excused.

**Defendant Alpern**

102.    Demand on Defendant Alpern is futile.  Defendant Alpern has served as a Company director since 2013 and serves as a member of the Nominations and Governance Committee and the Public Policy Committee.  Defendant Alpern receives compensation from the Company, including $335,929 in the fiscal year ended December 31, 2017.  Defendant Alpern conducted little oversight of the Company's engagement in the kickback scheme.  Defendant Alpern signed the 2014-2017 10-Ks that contained the false and misleading statements referenced herein.

**Defendant Austin**

103.    Demand on Defendant Austin is futile.  Defendant Austin has served as a Company director since 2013 and serves as Chairperson of the Audit Committee and a member of the Compensation Committee.  Defendant Austin receives compensation from the Company, including $320,300 in the fiscal year ended December 31, 2017.  Defendant Austin conducted little oversight of the Company's engagement in the kickback scheme.  Defendant Austin signed the 2014-2017 10-Ks that contained the false and misleading statements referenced herein.

**Defendant Burnside**

104.    Demand on Defendant Burnside is futile.  Defendant Burnside has served as a Company director since 2013 and serves as a member of the Audit Committee and Nominations and

Governance Committee. Defendant Burnside receives compensation from the Company, including $320,981 in the fiscal year ended December 31, 2017. Defendant Burnside conducted little oversight of the Company's engagement in the kickback scheme. Defendant Burnside signed the 2014-2017 10-Ks that contained the false and misleading statements referenced herein.

**Defendant Liddy**

105.     Demand on Defendant Liddy is futile. Defendant Liddy has served as a Company director since 2013 and serves as Chairperson of the Compensation Committee and as a member of the Public Policy Committee. Defendant Liddy receives compensation from the Company, including $309,981 in the fiscal year ended December 31, 2017. Defendant Libby conducted little oversight of the Company's engagement in the kickback scheme. Defendant Liddy signed the 2014-2017 10-Ks that contained false and misleading statements referenced herein.

**Defendant Rapp**

106.     Demand on Defendant Rapp is futile. Defendant Rapp has served as a Company director since 2013 and serves as Chairperson of the Public Policy Committee and as a member of the Audit Committee. Defendant Rapp receives compensation from the Company, including $342,025 in the fiscal year ended December 31, 2017. Defendant Rapp conducted little oversight of the Company's engagement in the kickback scheme. Defendant Rapp signed the 2014-2017 10-Ks that contained the false and misleading statements in the 2014-2017 10-Ks referenced herein.

**Defendant Tilton**

107.     Demand on Defendant Tilton is futile. Defendant Tilton has served as a Company director since 2013, and serves as Lead Director, Chairperson of the Nominations and Governance Committee, and as a member of the Compensation Committee. Defendant Tilton receives compensation from the Company, including $359,981 in the fiscal year ended December 31, 2017.

Defendant Tilton conducted little oversight of the Company's engagement in the kickback scheme. Defendant Tilton signed the 2014-2017 10-Ks that contained the false and misleading statements referenced herein.

## Defendant Waddell

108.    Demand on Defendant Waddell is futile.  Defendant Waddell has served as a Company director since 2013 and serves as a member of the Audit Committee and the Compensation Committee.  Defendant Waddell receives compensation from the Company, including $320,981 in the fiscal year ended December 31, 2017.  Defendant Waddell conducted little oversight of the Company's engagement in the kickback scheme.  Defendant Waddell signed the 2014-2017 10-Ks that contained the false and misleading statements referenced herein.

## Defendant Hart

109.    Demand on Defendant Hart is futile.  Defendant Hart has served as a Company director since 2013 and serves as a member of the Nominations and Governance Committee. Defendant Hart receives compensation from the Company, including $314,981 in the fiscal year ended December 31, 2017.  Defendant Hart conducted little oversight of the Company's engagement in the kickback scheme.  Defendant Hart signed 2016 and 2017 10-Ks that contained the false and misleading statements referenced herein.

## Defendant Meyer

110.    Demand on Defendant Meyer is futile.  Defendant Meyer has served as a Company director since 2013 and serves as a member of the Audit Committee and the Public Policy Committee. Defendant Meyer receives compensation from the Company, including $274,731 in the fiscal year ended December 31, 2017.    Defendant Meyer conducted little oversight of the Company's

31

engagement in the kickback scheme. Defendant Meyer signed the 2017 10-K that contained the false and misleading statements referenced herein.

## FIRST CAUSE OF ACTION

### (Against the Director Defendants for Breach of Fiduciary Duty)

111.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

112.     The Director Defendants owed and owe AbbVie fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe AbbVie the highest obligation of good faith, fair dealing, loyalty and due care.

113.     The Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

114.     The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

115.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, AbbVie has sustained significant and actual damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

116.     Plaintiff, on behalf of AbbVie, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against Defendants for Unjust Enrichment

117.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

32

118.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of AbbVie in the form of salaries, bonuses, and other forms of compensation.

119.    Plaintiff, as a shareholder and representative of AbbVie, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

120.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

121.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

122.    As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

123.    As a result of the misconduct alleged herein, Defendants are liable to the Company. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against Defendants for Waste of Corporate Assets)

124.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

33

125.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

126.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

127.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Against Defendants for Violations of
### Section 10(b) of the Exchange Act and SEC Rule 10b-5)

128.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.     During the Relevant Period, Defendants disseminated or approved public statements that failed to disclose accurate information to the shareholders.

130.     As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud; and

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

131.    As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

### SIXTH CAUSE OF ACTION

**(Against the Director Defendants for Violations
of Section 14(a) of the Exchange Act and SEC Rule 14a-9)**

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's SPO violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because it included materially false and misleading information and failed to disclose accurate information to the shareholders.

134.    The 2014-2018 Proxy Statements failed to disclose that: (a) the Company engaged in a kickback scheme, leading to increased scrutiny from governmental agencies; and (b) the Company failed to maintain internal controls.

135.    The 2014-2018 Proxy Statements state that the Company's executive officers submit annually certifications related to their compliance with the Code of Conduct and that the Company requires mandatory training on its code of conduct.  In addition, the 2014-2018 Proxy Statements reference the Governance Guidelines.  The 2014-2018 Proxy Statements were false and misleading because the Company's Code of Conduct and Governance Guidelines were not followed as a result of the misconduct detailed herein.

136.    The Director Defendants also caused the 2014-2018 Proxy Statements to be false and misleading regarding the executive compensation.  For example, the 2014-2018 Proxy Statements purported to employ a "pay-for- performance process" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements.

137.    The Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts stated herein, the statements contained in the 2014-2018 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2014-2018 Proxy Statements, including but not limited to, election of directors, approval of executive compensation, and ratification of an independent auditor.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff pray for relief and judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.    Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and waste of corporate assets;

C.    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: February 13, 2019

**LITE DePALMA GREENBERG, LLC**

By:    */s/ Katrina Carroll*_____
       Katrina Carroll
       111 West Washington Street, Suite 1240
       Chicago, IL 60602
       Tel: (312) 750-1265
       Fax: (312)212-5919
       Email: kcarroll@litedepalma.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiff*

## VERIFICATION

I, MARK ELFERS, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __12th__ day of February 2019.

_____

MARK ELFERS